1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| THOMAS P. BORTOLAZZO CONSTRUCTION, INC., a California Corporation, and NORTH AMERICAN CAPACITY INSURANCE COMPANY, a New Hampshire Corporation,<br><br>        Plaintiffs,<br><br>        vs.<br><br>INDIAN HARBOR INSURANCE COMPANY and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No. CV 09-7307 GAF (JEMx)<br><br>MEMORANDUM & ORDER REGARDING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT INDIAN HARBOR INSURANCE COMPANY AND MOTIONS FOR PARTIAL SUMMARY JUDGMENT RE: DUTY TO DEFEND BY THOMAS P. BORTOLAZZO CONSTRUCTION, INC. AND NORTH AMERICAN CAPACITY INSURANCE COMPANY |
| INDIAN HARBOR INSURANCE COMPANY,<br><br>        Counter-Claimant,<br><br>        vs.<br><br>THOMAS P. BORTOLAZZO CONSTRUCTION, INC., a California Corporation, and NORTH AMERICAN CAPACITY INSURANCE COMPANY, a New Hampshire Corporation,<br><br>        Counter-Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## INTRODUCTION & BACKGROUND

Thomas P. Bortolazzo Construction, Inc. ("Bortolazzo"), and fourteen subcontractors constructed a home for Lee and Elizabeth Gabler ("the Gablers"). Unsatisfied with the work, the Gablers filed an arbitration demand against Bortolazzo and the subcontractors in February 2008. Bortolazzo tendered its defense to Indian Harbor Insurance Co. ("Indian Harbor"), the insurer that insured it under a commercial general liability policy at the time. Indian Harbor declined coverage both because it concluded that its policy was excess to other policies issued to subcontractors on which Bortolazzo had been named as an additional insured and because it concluded that the Gablers' arbitration demand did not allege "property damage" that would be covered by the policy. Bortolazzo also tendered its defense to North American Capacity Insurance Co. ("NAC"), the insurer that insured it in 2007, and NAC accepted the defense. Bortolazzo and NAC (collectively, "Plaintiffs") now bring suit against Indian Harbor. Bortolazzo asserts claims for breach of contract, declaratory relief with respect to the duty to defend, and breach of the implied covenant of good faith and fair dealing, and NAC asserts a claim for equitable contribution. (Docket No. 25, First Am. Compl. ("FAC") ¶¶ 24–57.) Indian Harbor has brought counter-claims against Plaintiffs for declaratory relief regarding the duty to defend, for declaratory relief regarding the duty to indemnify, for reimbursement of money paid to Bortolazzo, and for equitable indemnity, equitable contribution, and equitable subrogation against NAC. (Docket No. 28, Counter-Claim ¶¶ 17–43.)

Indian Harbor now moves for summary judgment on each cause of action in Plaintiffs' First Amended Complaint (Docket No. 53), and Bortolazzo and NAC move for partial summary judgment on the issue of Indian Harbor's duty to defend on a pro rata basis with NAC (Docket Nos. 59, 60). For the reasons set forth below, the Court concludes that the undisputed facts show that Indian Harbor had a duty to defend Bortolazzo in the Gabler arbitration. The Court therefore **DENIES** Indian Harbor's

motion for summary judgment and **GRANTS** partial summary judgment to Bortolazzo and NAC as to the duty to defend.

**II.**

**FACTS**

Lee and Elizabeth Gabler ("the Gablers") entered into a contract with Bortolazzo for the construction of a single-family residence. (Docket No. 62-1, Thomas P. Bortolazzo Construction, Inc.'s Separate Statement of Facts ("Bortolazzo SSF") ¶ 1.) Bortolazzo then entered into subcontracts with fourteen contractors, including Anacapa Concrete, Inc. ("Anacapa"), a concrete subcontractor, and Solid Rock Construction & Fine Carpentry, Inc. ("Solid Rock"), a carpentry subcontractor. (Id. ¶ 2; Docket No. 81, Defendant's Response to Plaintiff's SSF ("Defendant's Reply SSF") ¶ 33.)

**A. THE SUBCONTRACTS**

The subcontracts with Anacapa and Solid Rock provided for indemnification of Bortolazzo. (Docket No. 56, Declaration of Max Stern ("Stern Decl."), Ex. 3 [Anacapa Subcontract] Section 15.1.1.; id., Ex. 4 [Solid Rock Subcontract] Section 15.1.1.) Specifically, the subcontracts provided that "Subcontractor shall indemnify and save harmless Owner and Contractor . . . of and from any and all claims . . . arising out of or in connection with Subcontractor's operations to be performed under the Agreement for, but not limited to [several categories of claims]." (Id., Ex. 3 Section 15.1.1; id., Ex. 4 Section 15.1.1.) The indemnification provision further provided:

> The indemnification provisions . . . shall extend to Claims occurring after this Agreement is terminated as well as while it is in force. Such indemnity provisions apply regardless of any active and/or passive negligent act or omission of Owner or Contractor or their agents or employees. Subcontractor, however, shall not be obligated under this Agreement to indemnify Owner or Contractor for Claims arising from the sole negligence or willful misconduct of Owner or Contractor[,] other agents, employees or independent contractors who are directly responsible to Owner or Contractor, or for defects in design furnished by such persons.

(Id., Ex. 3 Section 15.1.1; id., Ex. 4 Section 15.1.1.)

3

The subcontracts further require Anacapa and Solid Rock to "carry Comprehensive General Liability or Commercial General Liability insurance covering all operations by or on behalf of Subcontractor providing insurance for bodily injury liability and property damage liability . . . ." (Id., Ex. 3 Section 16.1.2; id., Ex. 4 Section 16.1.2.) The subcontracts also require the subcontractors to name Bortolazzo as an additional insured in their insurance policies:

> Contractor, his officers, directors and employees and Owner shall be named as additional insured under the Comprehensive General Liability insurance policy. The policy shall stipulate that the insurance afforded the additional insured shall apply as primary insurance and that any other insurance carried by Contractor, his Officers, Directors and employees or Owner will be excess only and will not contribute with this insurance.

(Id., Ex. 3 Section 16.1.2.2; id., Ex. 4 Section 16.1.2.2.)

The subcontracts also require the subcontractors to provide Bortolazzo with certificates of insurance, which must read:

> The Certificate Holder, Owner, and Architect are included as additional insured on the above General Liability and Automobile Liability Insurance Policies, which policies shall be primary in respect to any loss or damages which arise out of work performed by the insured on the Gabler Residence Project. . . ."

(Id., Ex. 3 Section 16.1.3; id., Ex. 4 Section 16.1.3.)

**B. THE SUBCONTRACTORS' INSURANCE POLICIES**

Pursuant to these subcontracting agreements, Anacapa and Solid Rock had commercial general liability insurance policies that named Bortolazzo as an additional insured. (Id., Ex. 10 [Anacapa Policy]; id., Ex. 11 [Solid Rock Policy].) These policies were issued by NAC. (Id., Ex. 10; id., Ex. 11.) Anacapa's policy was in effect March 12, 2005, to March 12, 2006, and Solid Rock's was in effect July 1, 2007, to July 1, 2008. (Id., Ex. 10; id., Ex. 11.)

These policies each contain an "other insurance" provision that provided that the policy was "primary" except in circumstances not applicable in this case. (Id., Ex. 10 at 191; id., Ex. 11 at 237.) The policies further explain that, "[i]f this insurance is primary, our obligations are not affected unless any of the other insurance is also

4

primary. Then, we will share with all that other insurance . . . ." (<u>Id.</u>) If, on the other hand, the insurance is excess, the insurer "will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.'" (<u>Id.</u>, Ex. 10 at 192; <u>id.</u>, Ex. 11 at 238.)

Both policies included an "Additional Insured" endorsement that provided that the policy would also cover the listed person or organization, "but only with respect to liability arising out of 'your work' for that insured by or for you." (<u>Id.</u>, Ex. 10 at 214; <u>id.</u>, Ex. 11 at 261.) Both policies' endorsements listed as additional insureds "[a]ny person or organization to which you are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to (1) occurrences taking place after such written contract has been executed and (2) occurrences resulting from work performed by you during the policy period." (<u>Id.</u>, Ex. 10 at 214; <u>id.</u>, Ex. 11 at 261.) The Solid Rock policy further clarified: "Coverage provided by this policy to the Additional Insured(s) shown in the Schedule shall be primary insurance and any other insurance maintained by the Additional Insured(s) shall be excess and non-contributory, but only if required by the Named Insured and by written contract." (<u>Id.</u>, Ex. 11 at 261.) The parties agree that these endorsements rendered Bortolazzo an additional insured under these policies. (Bortolazzo SSF ¶ 21.)

**C. BORTOLAZZO'S INSURANCE POLICIES**

Bortolazzo had two insurance policies that are relevant to this case: (1) a commercial general liability policy from Indian Harbor, effective December 31, 2007, to December 31, 2008; and (2) a commercial general liability policy from NAC, effective December 31, 2006, to December 31, 2007. (Stern Decl., Ex. 7; Docket No. 63-7, Declaration of Michael Faircloth ("Faircloth Decl.), Ex. A [NAC-Bortolazzo Policy].)

### 1. INDIAN HARBOR POLICY

#### a. Coverage Terms

The Indian Harbor policy issued to Bortolazzo provides that Indian Harbor "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." (Stern Decl., Ex. 7 at 95.) The policy further provides that the insurance applies to "property damage" only if it "occurs during the policy period," "is caused by an 'occurrence' that takes place in the 'coverage territory,'" and no insured or employee knew about the damage before the policy period. (Id.) The policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Id. at 108.) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 107.)

#### b. Other Insurance Provision

The Indian Harbor policy also contains an "other insurance" provision that provides that "[t]his insurance is primary except when b. below applies." (Id. at 104.) Under section "b," the Indian Harbor insurance "is excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement." (Id.)

The policy provides that, if the insurance is primary, Indian Harbor's obligations "are not affected unless any of the other insurance is also primary." (Id.) In that case, Indian Harbor "will share with all that other insurance by the method"

described later in the policy.  (Id.)  If, on the other hand, the Indian Harbor insurance is excess, Indian Harbor "will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.' If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers."  (Id.)  When the insurance is excess, Indian Harbor will "pay only [its] share of the amount of loss, if any, that exceeds the sum of" the total amount that other insurance would pay for the loss in the absence of the Indian Harbor insurance and the total of all deductible and self-insured amounts under all the other insurance.  (Id. at 104–05.)

The policy also includes a "Hired Contractors Endorsement."  (Id. at 144.)  This Endorsement provides that "[i]f you hire a 'contractor' to perform work for you or on your behalf, this insurance applies to all sums the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' resulting from that work."  (Id.)  The Endorsement further provides, however, that "[t]his insurance is excess over any other insurance available to you as an additional insured from any 'contractor,' whether such other insurance is primary, excess, contingent or on any other basis."  (Id.)  "Contractor" is defined to include subcontractors.  (Id. at 145.)

## 2. NAC POLICY

The NAC policy issued to Bortolazzo contains an "other insurance" provision that is substantively identical to that in the Indian Harbor Policy.  (Defendant's Reply SSF ¶ 37.)

## D. THE GABLERS' ARBITRATION DEMAND

Construction of the Gablers' residence was completed in July or August 2007, and a Certificate of Occupancy was issued on May 9, 2007.  (Bortolazzo SSF ¶¶ 6, 34; Defendant's Reply SSF ¶ 34.)  In February 2008, the Gablers filed an arbitration demand against Bortolazzo for allegedly deficient work on the construction of their residence.  (Bortolazzo SSF ¶ 7.)  The Demand for Arbitration primarily concerned delays and defects in construction.  In their responses to requests for interrogatories,

7

NAC and Bortolazzo pointed to the following portions of the arbitration demand as alleging "property damage." (Id. ¶ 29.)

> 9. Pursuant to the General Contract, TBC was to achieve substantial completion of the entire work on the Project not later than October 7, 2005. The General Contract notes that "[t]ime is of the essence of all of the Contractor's obligations under the Contract Documents." (General Contract at "Insert 4.3".) However, throughout the Project, TBC consistently failed to complete work on schedule.

> 10. Furthermore, TBC failed to perform construction in a workmanlike manner. Indeed, much of the work TBC claimed to be "completed" was defect-laden and had to be completely re-done or was simply not done. And, without justification or authorization from the Gablers, TBC repeatedly deviated from the approved architectural plans and grading plan, and he used inferior materials.

> 11. In or about December 2005, the Gablers became aware that TBC had not completed the amount of work commensurate to the progress payments paid, and had not made payment to its subcontractors and suppliers of all amounts previously billed to and paid by the Gablers on account of such subcontractors and suppliers, and that the work on the project appeared to be significantly under-completed, over-budget, and improperly finished. The Gablers immediately demanded that TBC provide accounting documentation and support for TBC's work. TBC failed to provide such documentation. Accordingly, the Gablers have expended a significant amount of their own time and effort, and substantial additional costs, hiring other subcontractors, repairing deficient construction done under TBC's supervision, and supervising the completion of the Project.

> 12. By December 2005, the Gablers had already paid TBC millions of dollars under the General Contract, all in response to TBC's invoices. Yet, the Project was in a shambles, incomplete, with work at a standstill and substantially behind schedule. Most importantly, the work under the General Contract was not completed to the level to which the Gablers were invoiced. The Gablers later discovered, including by admissions of TBC's staff, that TBC sought payments from the Gablers by way of monthly applications for payment (or invoices), which the Gablers paid in good faith. However, these invoices did not correspond to the much lower level of work actually performed at the Project. TBC just billed at the discretion of the principal, Thomas Bortolazzo, without regard to the percentage of work completed or the work in violation of the terms of the General Contract. Portions of the Project were left exposed to the elements and unprotected during construction, even when construction was at a standstill.

> 13. Following TBC's departure from the Project the Gablers discovered that much of the work performed by TBC and its subcontractors on the Project was improper, defective, or otherwise not in conformance with plans and specifications or industry norms.

> *  *  *

17. As a result of the unfinished and defective construction, the Gablers incurred substantial additional costs to finish, repair and replace and/or correct the improper and defective work.

\* \* \*

22. The Gablers are informed and believe, and on that basis allege, that TBC has breached the General Contract and the implied covenant of good faith and fair dealing in numerous respects including, but not limited to, the following:

> (a) Failing to perform its work in a timely, good and workmanlike manner, and failing to supervise its employees and subcontractors, to perform defect-free work, in conformance with the plans and specifications for the Project and all applicable building codes and legal standards;
> (b) Failing to properly supervise and monitor the construction so that it proceeded on schedule;
> (c) Overcharging the Gablers for work of subcontractors/suppliers who failed to perform their obligations on the Project;
> (d) Failing to maintain adequate and complete records of the work done, and the costs for such work;
> (e) Billing and collecting for improper charges and kickbacks; and
> (f) Improperly billing not in accordance with the percentage of work completed and billing for work not yet completed.

23. As a proximate result of TBC's multiple breaches of contract, the Gablers have suffered substantial damages including, without limitation: having to repair, replace and correct the defective work performed by TBC and its subcontractors; being forced to defend against the claims of subcontractors of TBC; being forced to pay to complete the work on the Project; suffering delays in completion of the Project; paying additional costs for an independent third party to evaluate the accounting records; and unknowingly overpaying TBC for work not reasonably completed or not reasonably charged. The exact amount of all such damages are unknown at this time, are subject to discovery and proof, plus attorneys' fees, interest, arbitration costs, and expert costs.

24. Pursuant to the General Contract, the Gablers are entitled to recovery of their attorneys' fees and costs incurred in this action and other actions concerning the Project and the General Contract. Thus, there is now due, owing and unpaid to the Gablers from TBC an amount not less than $100,000, together with interest according to law, subject to proof.

\* \* \*

26. As general contractor, TBC owed a legal duty of due care to the Gablers to properly perform its work in a timely, good, workmanlike and nonnegligent manner, and to supervise the work of its subcontractors to the same standard, consistent with all applicable codes, laws and regulations and the plans and specifications for the Project, and consistent with the standard of care applicable to similarly situated general contractors on similar projects.

\* \* \*

29. TBC breached its duty of care to the Gablers by negligently performing its work and mismanaging the Project. In the manner alleged above, TBC's negligent acts and omissions resulted in improper, defective work, incomplete construction, inefficiency and waste, and delays on the Project. Specifically, TBC's negligence included:

(a) Failing to perform its work in a timely, good and workmanlike manner, and failing to supervise its employees and subcontractors, perform defect-free work, in conformance with the plan and specifications for the Project in all applicable building codes and legal standards;

(b) Failing to properly supervise and monitor the construction so that it proceeded on schedule;

(c) Overcharging the Gablers for work of subcontractors/suppliers who failed to perform their obligations on the Project;

(d) Failing to maintain adequate and complete records of the work done, and the costs for such work;

(e) Billing and collecting for improper charges and kickbacks; and

(f) Improperly billing not in accordance with the percentage of work completed and billing for work not yet completed.

30. Each of the subcontractors and materialmen hired by TBC owe a duty of care to the Gablers to properly perform their work or supply materials in a good, workmanlike and nonnegligent manner, consistent with all applicable codes, laws and regulations and the plans and specifications for the Project and consistent with the standard of care applicable to similarly situated subcontractors and suppliers on similar projects. Several subcontractors breached their duties of care to the Gablers by failing to perform, supplying defective materials to the Project, overcharging the Gablers for work not done and for improper kickbacks, or performing improper, defective work.

* * *

32. As a direct and proximate result of TBC's negligence, the Gablers have suffered significant damages in an amount according to proof.

* * *

34. During the course of its work on the Project, TBC submitted invoices to the Gablers continuing representations that were false and misleading. The misrepresentations included the following:

(a) TBC requested payment for work that was either incomplete or defective and, therefore, not compensable under the General Contract. The invoices did not correspond to the actual percentage of work completed on the Project.

(b) TBC overcharged for work conducted by subcontractors and his own employees. TBC orchestrated a kickback scheme, requiring subcontractors to inflate their bids and subcontracts to include amounts for kickbacks to TBC, and charged the Gablers for TBC employees who worked on the scheme.

(c) TBC misrepresented the quality of the work on the Project, including charging for inferior quality materials.

10

(d) TBC demanded and collected payment for work not yet completed (for example, charging for more lineal feet of stone work than was actually done on the masonry bill).

\* \* \*

40. As a proximate result of TBC's negligent misrepresentations, the Gablers have suffered substantial damages in the form of amounts overpaid to TBC, and additional monies paid to subcontractors in order to complete work on the Project.

(SSF ¶ 8.)

## E. BORTOLAZZO'S TENDER OF DEFENSE TO INDIAN HARBOR

After receiving the Gablers' arbitration demand, Bortolazzo tendered its defense to Indian Harbor on March 17, 2008. (Id. ¶ 13.) At that time, the only document that Bortolazzo gave to Indian Harbor was a copy of the Demand for Arbitration. (Id. ¶ 14.) Indian Harbor denied coverage on April 29, 2008. (Faircloth Decl., Ex. I.) Indian Harbor's coverage denial letter explained (1) that coverage was precluded because its "investigation revealed that [Bortolazzo] was aware of the plaintiffs' allegations prior to the inception date of the Indian Harbor policy"; and (2) that, "even if the incident occurred during our policy period," the policy's "contractual liability" and "damage to your work" exclusions precluded coverage. (Id. at 221–22.)

Bortolazzo again sought defense from Indian Harbor on November 6, 2008. (Defendant's Reply SSF ¶ 64.) Indian Harbor again denied coverage on March 11, 2009, explaining in part that "Bortolazzo has not demonstrated potentially covered damages within the scope of the coverage afforded by the policy. There are no allegations of liability for covered damages, and Indian Harbor has no information outside of the Arbitration Demand of the existence of potentially covered damages." (Id. ¶ 65.) This denial of coverage letter also cited the Hired Contractors Endorsement providing that the Indian Harbor policy is excess over subcontractors' insurance that names Bortolazzo as an additional insured. (Faircloth Decl., Ex. K at 236.)

On August 14, 2009, Bortolazzo forwarded Indian Harbor the Gablers' Preliminary Claims List. (Defendant's Reply SSF ¶ 68; Faircloth Decl., Ex. P.) The Claims List noted, among other things, defective waterproofing that "resulted in

flooding of underfloor areas and mechanical system ductwork" and damage to gypsum wallboard, paint, and ductwork from water intrusion. (Faircloth Decl., Ex. E at 116, 117, 118, 122, 123, 124, 125, 126.) After receiving this list, Indian Harbor again denied coverage on August 20, 2009. (Faircloth Decl., Ex. Q.) This coverage denial letter indicated that Indian Harbor had properly denied the claim on April 29, 2008, because the Gabler project was completed in mid-2007 and "the alleged construction defects and associated repairs and/or replacement took place prior to the completion of the Gabler project," all of which was before the Indian Harbor policy took effect on December 31, 2007. (Id. at 291.) In this letter, Indian Harbor also reserved its right to rescind the policy based on any material misrepresentations or omissions. (Id. at 293.)

In letters dated September 15 and September 24, 2009, Bortolazzo requested that Indian Harbor reconsider its denial. (Faircloth Decl., Exs. R, S.) On October 1, 2009, Indian Harbor agreed to participate in the defense. (Faircloth Decl., Ex. T.) In its letter agreeing to defend, Indian Harbor indicated that it would participate in the defense "subject to our denial of coverage for certain allegations and reservation of rights set forth below." (Id. at 299.) More specifically, Indian Harbor reserved rights including, among other things, (1) its right "to not pay for a judgment or settlement to the extent Indian Harbor determines that such liability is not covered"; (2) its right "to initiate a separate action to determine its duty to defend or indemnify Bortolazzo"; (3) its "right to withdraw from Bortolazzo's defense if there is no potential for covered liability to be imposed on Bortolazzo in the Action." (Id. at 314–15.)

Bortolazzo had also tendered its defense to NAC. (Bortolazzo SSF ¶ 22.) NAC accepted the defense of Bortolazzo under the policy issued to Bortolazzo and those issued to Anacapa and Solid Rock that named Bortolazzo as an additional insured. (Id. ¶¶ 23–24; Defendant's Reply SSF ¶ 58.)

**F. SETTLEMENT AND DEFENSE COSTS**

Indian Harbor never paid any amounts toward Bortolazzo's defense. (Defendant's Reply SSF ¶ 77.) The Gablers and Bortolazzo reached a settlement in

principle on October 2, 2009, the day after Bortolazzo agreed to participate in the defense (id. ¶ 79), and executed a final agreement in November 2009. (Faircloth Decl., Ex. U.) Under the settlement, Bortolazzo and the subcontractors agreed to settle for an aggregate of $1 million, with Anacapa paying $50,000, Solid Rock paying $40,000, and Bortolazzo paying $672,807. (Id. at 338–39.) Indian Harbor paid $150,000 in indemnity on behalf of Bortolazzo. (Defendant's Reply SSF ¶ 78.)

## III.

## DISCUSSION

### A. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. Id. at 256. The moving party can meet this burden by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court . . . that there is an absence of evidence" supporting a fact for which the nonmoving party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). To defeat summary judgment, the nonmoving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." Anderson, 477 U.S. at 256–57. This evidence must be admissible. See Fed. R. Civ. P. 56(c), (e). The nonmoving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must show that evidence in the record could lead a rational trier of fact to find for it. See id. at 587. In reviewing the record, the Court must believe the nonmoving party's evidence, and must draw all justifiable inferences in its

13

favor.  <u>Anderson</u>, 477 U.S. at 255.

**B. APPLICATION**

Plaintiffs each move for partial summary judgment solely as to Indian Harbor's duty to defend.  (Docket Nos. 59, 60.)  Defendant Indian Harbor moves for summary judgment on all claims on the ground that it has no duty to defend, and that, by extension, it can have no duty to indemnify and no liability for bad faith or breach of contract.  (Docket No. 53.)

Indian Harbor contends that it had no duty to defend Bortolazzo in the Gabler arbitration (1) because its policy was excess to the NAC policies issued to Anacapa and Solid Rock on which Bortolazzo was named as an additional insured, and (2) because, in any event, the Gabler arbitration demand did not make any allegations suggesting that they sought recovery for "property damage" that would be covered by the Indian Harbor policy.  Bortolazzo and NAC disagree with both of these arguments and further contend that, regardless, Indian Harbor is estopped from denying its duty to defend. They seek summary judgment on these grounds.  The Court addresses each of these issues in turn.

**1. WHETHER INDIAN HARBOR'S POLICY IS EXCESS**

The pertinent facts relating to the whether Indian Harbor's policy was excess are not in dispute.  As required by the subcontracts, the Anacapa and Solid Rock policies with NAC both included an "Additional Insured" endorsement that provided that the policies would also cover the listed person or organization, "but only with respect to liability arising out of 'your work' for that insured by or for you."  (Stern Decl., Ex. 10 at 214; <u>id.</u>, Ex. 11 at 261.)  Both policies' endorsements listed as additional insureds "[a]ny person or organization to which you are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to (1) occurrences taking place after such written contract has been executed and (2) occurrences resulting from work performed by you during the policy period."  (<u>Id.</u>, Ex. 10 at 214; <u>id.</u>, Ex. 11 at 261.)  The Solid Rock policy further provided: "Coverage

provided by this policy to the Additional Insured(s) shown in the Schedule shall be primary insurance and any other insurance maintained by the Additional Insured(s) shall be excess and non-contributory, but only if required by the Named Insured and by written contract." (Id., Ex. 11 at 261.) The parties agree that these endorsements rendered Bortolazzo an additional insured under these policies. (Bortolazzo SSF ¶ 21.)

The Indian Harbor insurance policy issued to Bortolazzo provided that it was a primary policy, but would be "excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement." (Stern Decl., Ex. 7 at 104.) That policy also included a "Hired Contractors Endorsement," which provided that the insurance was "excess over any other insurance available to you as an additional insured from any 'contractor,' whether such other insurance is primary, excess, contingent or on any other basis." (Id. at 144.)

The parties dispute the effect of these provisions. Indian Harbor contends that the additional insured endorsements in the Anacapa and Solid Rock policies render Indian Harbor's policy excess without limitation, while Plaintiffs contend that the additional insured endorsements render the Indian Harbor policy excess only with respect to liability arising out of the subcontractors' work on the project, and not with respect to liability arising out of Bortolazzo's own negligence or the negligence of other subcontractors. In support of their respective arguments, Indian Harbor relies on Hartford Casualty Insurance co. v. Travelers Indemnity Co., 2 Cal. Rptr. 3d 18 (Ct. App. 2003), while Plaintiffs rely on Maryland Casualty Co. v. Nationwide Mutual Insurance Co., 97 Cal. Rptr 2d 374 (Ct. App. 2000). The Court concludes that Maryland Casualty controls and that Hartford Casualty is clearly distinguishable.

### a. *Maryland Casualty*

In Maryland Casualty, the court faced a similar situation in which a general contractor required subcontractors to name it as an additional insured in their liability

policies and to provide that those policies would be primary and non-contributing. Maryland Cas., 97 Cal. Rptr. 2d at 376. Pursuant to those subcontracting agreements, the subcontractors obtained liability insurance coverage that named the general contractor as an additional insured but provided that "this insurance with respect to [the general contractor] applies only to the extent that [the general contractor] is held liable for your acts or omissions arising out of and in the course of operations performed for [the general contractor]." Id. One of the subcontractor's endorsements further provided that coverage to the additional insured "is primary, but only with respect to acts or omissions of the named insured. Any other insurance maintained by the additional insured is deemed to be excess." Id. The general contractor also had its own commercial general liability policies that were primary policies. Id.

There, a homeowner's association sued the general contractor for construction defects. Id. As in this case, the general contractor's insurance provider contended that the subcontractors' insurance, by virtue of the additional insured endorsements, was primary as to all defense costs, including amounts pertaining only to the general contractor's own negligence. Id. at 377. The court rejected this interpretation of the subcontractors' insurance policies, concluding it was "not reasonable." Id. at 378. The court explained that "the goal of insurance contract interpretation is to give effect to the mutual intent of the parties," and that where the language is in any way ambiguous, "the court must determine the interpretation that is most consistent with the insured's objectively reasonable expectations." Id. (internal quotations and citation omitted). The contract's language "must be construed in the context of that instrument as a whole, and in the circumstances of that case." Id.

The court noted that the subcontractors' policies named the general contractor as an additional insured but stated that the policies would apply to the general contractor "only to the extent that [the general contractor] is held liable for your [the subcontractor's] acts or omissions arising out of and in the course of operations performed for [the general contractor]." Id. (quoting policy). The court held that these

provisions "created the limited vicarious liability coverage for the additional insured." Id. The provision in one subcontractor's policy providing that coverage to the additional insured would be primary, "but only with respect to acts or omissions of the named insured," confirmed the limited nature of the coverage. Id. A line in that policy stating that "[a]ny other insurance maintained by the additional insured is deemed to be excess" did not render the general contractor's policy completely excess. Such a reading "would alter the purpose and nature of the additional insured endorsement by creating coverage for all of [the general contractor's] direct acts and for the other subcontractors' acts. It would not be reasonable for the parties to so carefully delineate the limited scope of the additional insurance coverage, and then in a single final sentence indirectly eliminate this limitation." Id. at 379.

Further, the court explained that it would not be reasonable to interpret the subcontractors' policies in the way the general contractor proposed "when viewed in the commercial context in which the policies arise." Id. Specifically, "[t]o conclude that because [the subcontractors' insurer] agreed to cover [the general contractor's] vicarious liability for two of the many subcontractors that were sued, it should be saddled with the entire remaining cost of the defense pertaining to acts having nothing to do with the insureds merely because it initially denied a defense duty, would not be within the reasonable expectations of the parties." Id. Thus, the court concluded, each insurer—the subcontractors' and the general contractor's—remained primarily responsible for the defense. Id. at 380.

The reasoning of Maryland Casualty fully applies here. There, as here, the subcontracting agreements required subcontractors to name the general contractor as an additional insured and to provide that that insurance would be primary. Pursuant to those agreements, in both Maryland Casualty and the case before this Court, the subcontractors' insurance policies provided coverage to the general contractor as an additional insured, but only with respect to liability arising out of the subcontractors' work. Further, in both Maryland Casualty and this case, one of the subcontractors'

policies specified that the coverage to the additional insured would be primary, and that other insurance maintained by the additional insured would be excess and non-contributory.  In Maryland Casualty, the court concluded that, in light of these facts, the subcontractors' insurance was primary only with respect to costs that related to their own work.  Id. at 378, 380.  Here, too, the provisions limiting NAC's coverage of Bortolazzo as an additional insured on the Anacapa and Solid Rock policies mean that Bortolazzo's own insurance with Indian Harbor is rendered excess only with respect to costs associated with Anacapa's and Solid Rock's own work.  As in Maryland Casualty, reading the subcontractors' policies as a whole, it is not reasonable to conclude that the subcontractors' insurer intended to provide coverage for all of Bortolazzo's direct acts and for the other subcontractors' acts.  Id. at 379.  Moreover, as in Maryland Casualty, considering the commercial context, it is not reasonable to expect that, because the subcontractors' insurer agreed to cover the general contractor's vicarious liability for two of the subcontractors, it thereby agreed to assume the costs of the entire defense. Id.

Indian Harbor contends that Maryland Casualty is distinguishable because that case did not involve an "other insurance" provision in the general contractor's policy that provided that the general contractor's policy would be excess to any other insurance available to it as an additional insured on any subcontractor's policy.  (Reply at 12–15.) This argument misses the mark.  To be sure, the Indian Harbor policy, unlike (possibly[1]) the general contractor's policy in Maryland Casualty, explicitly provides that it will be excess over any other "primary insurance available to [Bortolazzo]" as an additional insured.  (See Stern Decl., Ex. 7 at 104, 144.)  This language in the contract between Indian Harbor and Bortolazzo, however, cannot expand the scope of the coverage provided in NAC's contract with the subcontractors.  Those policies alone define the

---

[1] It is unclear whether the general contractor's policy in Maryland Casualty contained a similar "excess only" provision.  In any event, the presence or absence of such a clause had no bearing on the Maryland Casualty court's reasoning.

scope of coverage, and they explicitly provide that the additional insured, Bortolazzo, will be covered "only with respect to liability arising out of 'your [the subcontractors'] work' for that insured by or for you." (Id., Ex. 10 at 214; id., Ex. 11 at 261.) The "excess only" clause in the Indian Harbor policy renders the Indian Harbor policy excess only over the coverage provided by the subcontractors' policies. Thus, the Indian Harbor policy is excess only over the NAC coverage for liability arising out of the subcontractors' work. It remains primary with respect to other liability, including liability for Bortolazzo's own negligence and liability arising out of other subcontractors' negligence (except to the extent those other subcontractors also have policies naming Bortolazzo as an additional insured).

Indian Harbor also suggests that it had no duty to defend Bortolazzo because NAC had a complete duty to defend the action. (Reply at 16–18.) In support, Indian Harbor points to cases holding that "[t]o defend meaningfully, the insurer must defend immediately. To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not." See Buss v. Superior Court, 939 P.2d 766, 775 (Cal. 1997) (citation omitted); Presley Homes, Inc. v. Am. States Ins. Co., 108 Cal. Rptr. 2d 686, 690 (Ct. App. 2001). The fact that NAC, by virtue of the Anacapa and Solid Rock policies, had a duty to defend the entire action, however, does not mean it had a duty to bear the entire costs of that defense. To the contrary, California law is clear that such an insurer can seek "contribution from other insurers obligated to defend the claim." Presley, 108 Cal. Rptr. 2d at 690. In other words, NAC's duty to defend the entire action does not eliminate any duty Indian Harbor also has to participate in the defense.

### b. Hartford Casualty

Hartford Casualty, the case on which Indian Harbor relies, addressed a strikingly different set of facts. In that case, a lease agreement required a tenant to name the landlord as an additional insured on the tenant's insurance policy, and to provide that the landlord's insurance is excess and non-contributing. Hartford Cas., 2 Cal. Rptr. 3d

at 21. The tenant accordingly obtained a commercial general liability policy from Hartford that included as an insured "any person or organization with whom you agreed, because of a written contract or agreement or permit, to provide insurance such as is afforded under this policy, but only with respect to your operations, 'your work' or facilities used or owned by you [the tenant]." Id. The policy did not contain the required language specifying that the insurance of such additional insureds would be excess and non-contributing. Id. At the same time, the landlord had a commercial general liability policy from Travelers, which provided that the landlord's policy would be "excess over any of the other Insurance; whether primary, excess, contingent or on any other basis: . . . [t]hat is valid and collectible Insurance available to you [landlord] if you are added as an additional insured under any other policy." Id. The policy further provided that, when that insurance is excess, Travelers would have no duty to defend any claim that the other insurer was obligated to defend. Id.

The respective obligations of the two insurers became the subject of a dispute when an employee of the tenant fell to his death from a balcony outside of the tenant's offices. Id. at 19–20. The employee's parents filed suit against the landlord for premises liability and negligence per se. Id. at 20. Hartford ultimately filed a suit seeking a declaration that it did not owe the landlord any defense or indemnity under the Hartford policy, and Travelers filed a cross-complaint seeking a declaration seeking a contrary declaration. Id.

The California Court of Appeal concluded that the employee's death was sufficiently connected to the tenant's use of the facilities to fall within the tenant's insurance coverage. Id. at 28. The court further concluded that the "excess only" clause in the Travelers policy was effective, and that Travelers accordingly had no duty to defend or indemnify the landlord. Id. at 21–22. The court explained that courts will "generally honor the language of excess 'other insurance' clauses when no prejudice to the interests of the insured will ensue." Id. at 29–30. Where, however, "two or more primary insurers' policies contain excess 'other insurance' clauses purporting to be

excess to each other, the conflicting clauses will be ignored and the loss prorated among the insurers on the ground the insured would otherwise be deprived of protection." Id. at 30 (quoting Fireman's Fund Ins. Co. v. Md. Cas. Co., 77 Cal. Rptr. 2d 296 (Ct. App. 1998)). The court recognized a "recent trend" toward declining to rigidly enforce excess only clauses, but concluded that "this case presents equities that favor enforcement of the excess clause as written." Id. Specifically, the court noted first that the "other insurance" provisions in the policies had only narrow exceptions to their operation as primary insurance, as opposed to a broad provision purporting to render the policies excess whenever there was any other insurance. Id. at 31. Both policies provided that they would be excess only where the "insured is covered as an additional insured on another party's policy for some specific event or situation." Id. Second, the court noted that the language of the two policies did not conflict. Id. Thus, enforcing the excess only clause would not leave the insured without coverage. Id. Moreover, Hartford had accepted the risk of covering additional insureds. Id. The court accordingly concluded that "[e]quity should not be employed to override the terms of the insurance policies in this case." Id.

Contrary to Indian Harbor's contention, the case before the Court is not on all fours with Hartford Casualty. In Hartford Casualty, the plaintiffs in the underlying suit brought claims based on a single, indivisible occurrence—a man falling to his death from a balcony on the property. Id. at 19–20. The court held that, under the terms of the tenant's insurance policy, the landlord was covered for this occurrence as an additional insured. Id. at 28. This distinction is dispositive. The tenant's policy covered the landlord as an additional insured, and the tenant's insurer was not held liable for any more than what the tenant's policy covered. By contrast, here, Indian Harbor asks the Court to hold that the subcontractors' insurer, NAC, has a duty to pay for the entire defense, including the portions not covered by its policy. Hartford Casualty does not require this result.

Peerless Insurance Co. v. St. Paul Surplus Lines Insurance Co., No. 09-cv-5, 2010

21

WL 2486795 (S.D. Cal. June 15, 2010), the other case on which Indian Harbor relies, does not support Indian Harbor's position either. There, as in Hartford Casualty, the underlying action involved claims based on a single occurrence, an industrial accident that injured an employee of a tenant. Id. at *1. Like the policy in Hartford Casualty, the tenant's insurance policy covered the landlord for such claims as an additional insured, and the landlord's policy provided that its coverage would be excess over any insurance that provided it protection as an additional insured. Id. at *1–2. The court held that the "excess only" clause in the landlord's policy was effective and that the tenant's insurer was liable for the full defense costs. Id. at *10–11. As in Hartford Casualty, and unlike here, this conclusion did not effectively expand the scope of the tenant's insurer's obligations.

### c. Effect of the Indemnity Provision in the Subcontracts

Indian Harbor also suggests that the indemnity provision in the subcontracts confirms that Indian Harbor's policy was intended to be excess over the subcontractors' policies naming Bortolazzo as an additional insured. In support, it cites Rossmoor Sanitation, Inc. v. Pylon, Inc., 532 P.2d 97 (Cal. 1975), which it contends held that an indemnity provision compelled the result that a subcontractor's insurer had sole primary liability. In Rossmoor, a subcontracting agreement required the subcontractor to indemnify the general contractor against all claims for damages arising out of the subcontractor's execution of the work and to name the general contractor as an additional insured in its liability policy. Id. at 98. Under the contractor's and subcontractor's policies, liability was to be apportioned whenever other insurance applied. Id. at 99. Employees of the subcontractor brought a tort suit against the general contractor for claims arising out of the subcontractor's work. Id. The court held that the indemnity agreement controlled, and that the loss would not be apportioned under the insurance policies. Id. at 104–05. In reaching that conclusion, the court explained that "to apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose

22

liability on [the general contractor's insurer] when [the general contractor] bargained with [the subcontractor] to avoid that very result as part of the consideration for the construction agreement." Id.

The case before this Court is plainly distinguishable. The indemnity agreement here provided only that Anacapa and Solid Rock would indemnify Bortolazzo "of and from any and all claims . . . arising out of or in connection with Subcontractor's operations to be performed under the Agreement." (Stern Decl., Ex. 3 [Anacapa Subcontract] Section 15.1.1.; id., Ex. 4 [Solid Rock Subcontract] Section 15.1.1.) It is undisputed that the Gabler arbitration demand asserted some claims arising out of Anacapa's and Solid Rock's work and some claims that did not. Here, unlike in Rossmoor, giving effect to the insurance policies' terms would not "effectively negate" the indemnity agreement. To the contrary, it would honor the agreement by ensuring that the subcontractors' insurer was not liable for more than the defense of the claims covered by the indemnification agreement.

For the foregoing reasons, the Court concludes that the Indian Harbor policy was not excess, and that Indian Harbor cannot avoid its duty to defend on that basis. Even though the subcontractors' NAC policies render the Indian Harbor policy excess with respect to the defense of claims relating to the subcontractors' work, they do not affect Indian Harbor's primary liability for the remainder of the claims.

## 2. WHETHER THE GABLER ARBITRATION ALLEGED "PROPERTY DAMAGE" WITHIN THE POLICY PERIOD

"A liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity." Montrose Chem. Corp. of Cal. v. Superior Court, 861 P.2d 1153, 1157 (Cal. 1993) (internal quotations, alteration, and citation omitted). The insurer "must defend a suit which potentially seeks damages within coverage of the policy." Id. (quotations and citation omitted). The duty to defend is broader than the duty to indemnify, and an insurer may owe a duty to defend in an action in which no damages are ultimately awarded. Id. To determine whether a duty to defend is owed,

the Court must first compare the complaint's allegations with the terms of the policy. Id. "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." Id. (quotations omitted). The existence of a duty to defend depends "upon those facts known by the insurer at the inception of a third party lawsuit," or at the time of tender. Id. (quotations omitted); see Baroco West, Inc. v. Scottsdale Ins. Co., 1 Cal. Rptr. 3d 464, 469 (Ct. App. 2003). "Any doubts as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." Montrose, 861 P.2d at 1160. To establish that there is no duty to defend, "the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential." Id. at 1161 (emphasis in original). "In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." Id. The insurer is excused from defending only if "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." Id. at 1160 (citation omitted) (emphasis in original).

On the other hand, "an insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date." Low v. Golden Eagle Ins. Co., 120 Cal. Rptr. 2d 827, 830 (Ct. App. 2002) (quotations omitted). "[T]he insured may not speculate about unpled third party claims to manufacture coverage." Hurley Constr. Co. v. State Farm Fire & Cas. Co., 12 Cal. Rptr. 2d 629, 631 (Ct. App. 1992). Further, once an insurer determines "that there was no potential for coverage, it d[oes] not have a continuing duty to investigate or monitor the lawsuit to see if the third party later made some new claim, not found in the original law suit." Gunderson v. Fire Ins. Exch., 44 Cal. Rptr. 2d 272, 279 (Ct. App. 1995).

The Indian Harbor policy requires it to defend Bortolazzo from seeking damages "because of 'bodily injury' or 'property damage' to which this insurance applies." (Stern Decl., Ex. 7 at 95.) The policy further provides that the insurance applies to

"property damage" only if it "occurs during the policy period" and no insured or employee knew about the damage before the policy period. (Id.) The policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Id. at 108.)

Indian Harbor contends that the allegations tendered to it did not raise any possibility of coverage (1) because the Gablers did not allege any "property damage" within the meaning of the policy, and (2) because, even if they did allege such "property damage," they did not allege any property damage within Indian Harbor's policy period. The Court addresses each contention in turn.

### a. Property Damage

Liability policies covering "property damage" do not provide contractors "coverage against claims their work is inferior or defective." Md. Cas. Co. v. Reeder, 270 Cal. Rptr. 719, 722–23 (Ct. App. 1990). Rather, "[t]he risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." Id. at 722. Liability insurance provides coverage, however, "when the insured's defective materials or work cause injury to property other than the insured's own work or products." Id. Thus, for example, defective materials and workmanship that produce an inferior home do not amount to "property damage." Id. at 723 (citing St. Paul Fire & Marine Ins. Co. v. Coss, 145 Cal. Rptr 836 (Ct. App. 1978)). On the other hand, when a supplier provides defective doors or defective plaster such that the doors have to be removed and replaced or the walls replastered, that causes "property damage." Id. at 724 (citing Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., 334 P.2d 881 (Cal. 1959), and Hauenstein v. St. Paul-Mercury Indem. Co., 65 N.W.2d 122 (Minn. 1954)). Similarly, allegations

that defective construction caused cracked concrete floor slabs and walls and allowed rain water to damage building structures and the contents of living areas amount to allegations of property damage. <u>Id.</u>

In assessing whether there were allegations of property damage giving rise to a duty to defend, the Court need only look to those facts known by the insurer at the time of tender. <u>See</u> <u>Montrose</u>, 861 P.2d at 1157. It is undisputed that Bortolazzo was tendered the Arbitration Demand, Partial Statement of Claims, and Statement of Damages. (Faircloth Decl., Ex. P; Stern Decl., Ex. 6.) Plaintiffs contend that at least ten allegations in the Arbitration Demand allege potential property damage. In particular, they cite the declaration of expert Charles Henderson, who opines that the following ten allegations "suggest the potential for coverage under acceptable industry standards, practices and procedures":

1. Work Bortolazzo claimed to be completed was defect-laden
2. Work had to be completely re-done
3. Deviated from the approved architectural plans and grading plan
4. Gabler expended significant and substantial costs, hiring other subcontractors, to repair deficient construction
5. Much of the work performed by Bortolazzo and its subcontractors was improper, defective
6. Gabler incurred substantial additional cost to finish, repair, replace and/or correct the improper and defective work
7. Failing to supervise its employees and subcontractors
8. Failing to perform defect-free work
9. Bortolazzo breached its duty of care to M/M Gabler by negligently performing its work
10. M/M Gabler have suffered substantial damages

(Docket No. 60-5, Declaration of Charles Henderson ("Henderson Decl.") ¶ 24.) Henderson's opinion that these allegations raised a possibility of coverage is inadmissible. An expert "cannot give an opinion as to her legal conclusion, <u>i.e.</u>, an opinion on an ultimate issue of law. <u>United States v. Moran</u>, 493 F.3d 1002, 1008 (9th Cir. 2007) (internal quotations and citation omitted). Whether these kinds of allegations constitute "property damage" within the meaning of the insurance policy is a question of law. <u>See</u> <u>Peerless</u>, 2010 WL 2486795, at *4 ("The interpretation of an insurance policy is a question of law."). The Court therefore will not consider Henderson's

opinion that these allegations suggested a potential for coverage. Nonetheless, the claims that Henderson identifies are helpful in showing what Plaintiffs contend raise the possibility that the Gablers sought recovery for "property damage."

Without more, these allegations in the Arbitration Demand do not amount to allegations of property damage and accordingly do not give rise to a duty to defend. Rather, these allegations amount to claims that defective workmanship produced an inferior home, which do not qualify as "property damage" under <u>Coss</u>. Notably, Henderson does not opine, for example, that defective construction almost always results in property damage such that a typical insurer, following industry standards, would conclude that there was a possibility of coverage for property damage based on allegations of construction defects. Absent any such evidence, these allegations do not reference any "property damage" as interpreted by California courts.

Moreover, the Arbitration Demand's reference to "damaged work," which Plaintiffs emphasized in the hearing on these motions, likewise do not amount to allegations of property damage. The Arbitration Demand refers to "damaged work" only in describing the terms of the general contract, which provided that Bortolazzo could not recover "costs for damaged, defective or nonconforming work" from the Gablers. (Stern Decl., Ex. 6 [Arbitration Demand] ¶ 6.) It does not in any way allege that the Gablers sought recovery for "damaged work."

The Partial Claims List, however, does include allegations that give rise to the possibility of coverage for property damage. For instance, the Claims List notes that defective waterproofing "resulted in flooding of underfloor areas and mechanical system ductwork." (Faircloth Decl., Ex. E at 116, 117, 118, 126.) Flooding likely gives rise to other damage to tangible property. The Claims List also notes that the gypsum wallboard, paint, and ductwork were damaged by water intrusion. (<u>Id.</u> at 122, 123, 124, 125.) These allegations resemble the cracked floor slabs and walls and rain-damaged building structures found to constitute "property damage" in <u>Reeder</u>. In sum, the Partial

Claims List sets forth descriptions of property damage that create the potential for coverage under the Indian Harbor policy.

With a potential for coverage established, the burden shifts to Indian Harbor to "establish the absence of any such potential." Montrose, 861 P.2d at 1161. Indian Harbor has not negated this potential. The Court explained at the hearing that Indian Harbor might be able to negate the potential for coverage if it could show, for example, that the property damage alleged in the Partial Claims List resulted from the work of a subcontractor whose insurance policy rendered Indian Harbor's policy excess as to that work. Indian Harbor did not indicate that it had any evidence that this was the case. Instead, Indian Harbor opposes the Plaintiffs' motion for summary judgment entirely on the proposition that this property damage could not have occurred during the Indian Harbor policy period. In such circumstances, the Partial Claims List gave rise to a duty to defend on the part of Indian Harbor <u>unless</u> Indian Harbor can show that, when it declined Plaintiffs' demand that it defend against the Gabler's claims, it was in possession of evidence establishing that there was no possibility that the property damage occurred during the policy period. The Court now turns to that issue.

### b. Within the Policy Period

Under California law, courts must apply a "continuous injury trigger" to determine when coverage is owed under a standard commercial general liability policy. <u>Pepperell v. Scottsdale Ins. Co.</u>, 73 Cal. Rptr. 2d 164, 167 (Ct. App. 1998). Under the Indian Harbor policy, coverage is limited to property damage caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Stern Decl., Ex. 7 at 95, 107.) Interpreting a similar policy providing coverage for "occurrences" meeting a substantively similar definition, California courts have held that "continuing or progressive property damage is deemed to occur over the entire process of the continuing injury." <u>Id.</u> at 169. Thus, an injury or occurrence is "a continuous process which beg[ins] at the time of negligent construction and continue[s] through the

manifestation of the . . . damage," even though there may be "a lapse of time between the initial negligent act and the occurrence of the ultimate damage." Id. (internal quotations and citation omitted). In other words, all insurers on the risk from the first exposure to the damage-causing condition up to the time the damage is discovered bear liability. Pejcha Revocable Trust v. State Farm Fire & Cas. Co., No. 94-20410, 1996 WL 417259, at *4 (N.D. Cal. July 23, 1996).

Indian Harbor argues that, even if the Gablers did allege property damage, they did not allege property damage within the policy period. It explains that the damage necessarily occurred during construction, which ended before the Indian Harbor policy took effect. This contention misapprehends California law regarding continuous injury. Although the negligent construction that ultimately resulted in damage of course necessarily occurred during the construction period, the manifestation of the damage may not have occurred until later. The record does not reveal when the Gablers claim to have discovered the damage to their property. They submitted their arbitration demand in February 2008 and their more detailed Partial Claims List in August 2009. There is accordingly a possibility that the damage was discovered during the Indian Harbor policy period between December 31, 2007, and December 31, 2008. Indian Harbor attempts to negate this possibility by arguing that the Arbitration Demand makes clear that all damage manifested during construction (and therefore before the inception of the Indian Harbor policy period), but this attempt is unavailing. Nothing in the Arbitration Demand indicates that all property damage occurred during construction, and Indian Harbor has offered no other evidence indicating when the relevant property damage became apparent. Indeed, the Arbitration Demand does not expressly describe any property damage at all.

Moreover, the argument is not entirely on target. To defeat summary judgment, Indian Harbor must show that it refused to defend against the Gabler's claims because it was in possession of information that established the absence of any possibility that the claims were covered by the policy. Indian Harbor presents no such evidence.

29

Accordingly, having failed to negate the possibility that it had a duty to defend its insured against the Gabler's claims, the motions of Bortolazzo and NAC for partial summary judgment on Indian Harbor's duty to defend is **GRANTED**.[2]

### 3. WHETHER INDIAN HARBOR IS ESTOPPED FROM DENYING ITS DUTY TO DEFEND

In the alternative, Plaintiffs contend that Indian Harbor is estopped from denying its duty to defend. Because the Court grants Plaintiffs summary judgment on the duty to defend on the ground that the Partial Claims List gave rise to the potential for coverage, it need not address this alternative argument.

### 4. INDIAN HARBOR'S RULE 56(D) REQUEST

Indian Harbor requests that, rather than grant summary judgment to Plaintiffs, the Court defer deciding Plaintiffs' motions for summary judgment to allow Indian Harbor to develop additional facts regarding (1) Bortolazzo's knowledge of the Gablers' claim before the policy period; (2) the amounts spent in Bortolazzo's defense; (3) the method for allocation of defense costs between NAC and Indian Harbor; and (4) Charles Henderson's expert opinions. (Opp. at 30.)

Under Federal Rule of Civil Procedure 56(d), "[t]he district court has discretion to continue a motion for summary judgment if the opposing party needs to discover essential facts." <u>Cal. Union Ins. Co. v. Am. Diversified Sav. Bank</u>, 914 F.2d 1271,

---

[2] Indian Harbor contends that Plaintiffs are nonetheless not entitled to summary judgment because there is a dispute over whether Bortolazzo knew about the damage before the policy period. If Bortolazzo had prior knowledge of the Gablers' claims, coverage would be precluded. (<u>See</u> Stern Decl., Ex. 7 at 95.) This argument misses the mark. Although a dispute over Bortolazzo's prior knowledge would preclude Plaintiffs from winning summary judgment on the question of <u>indemnity</u>, it does not preclude them from winning summary judgment on the question of the <u>duty to defend</u>. As explained above, a duty to defend arises when there is a possibility of coverage. "Any doubts as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." <u>Montrose</u>, 861 P.2d at 1160. Without conclusively demonstrating the absence of any potential for coverage, Indian Harbor cannot avoid its duty to defend. Indian Harbor concedes that Bortolazzo's prior knowledge of the damages alleged is a disputed factual issue. They accordingly have not shown the absence of the potential for coverage necessary to negate their duty to defend.

1278 (9th Cir. 1990); see also Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan, 662 F.2d 641, 645 (9th Cir. 1981) ("Before summary judgment may be entered against a party, that party must be afforded . . . an adequate opportunity to respond. Implicit in the 'opportunity to respond' is the requirement that sufficient time be afforded for discovery necessary to develop 'facts essential to justify (a party's) opposition' to the motion." (quoting Fed. R. Civ. P. 56) (alteration in original)). A party seeking a Rule 56(d) continuance must demonstrate diligence and identify specific facts that it could discover that would preclude summary judgment. Tatum v. City & Cnty. of S.F., 441 F.3d 1090, 1100 (9th Cir. 2006); see Jones v. Blanas, 393 F.3d 918, 930 (9th Cir. 2004).

Indian Harbor is not entitled to a Rule 56(d) continuance because it has not identified any facts it could discover that would preclude summary judgment. First, as explained above, Bortolazzo's prior knowledge about the damage to the Gabler property cannot defeat the duty to defend because Indian Harbor had the duty to defend until it could conclusively negate that duty. It clearly has not yet done so. Second, the amounts spent in Bortolazzo's defense and the proper method for allocating defense costs between NAC and Indian Harbor do not bear on the motion before the Court. Plaintiffs seek partial summary judgment only as to Indian Harbor's duty to defend. They do not seek summary judgment on the calculation of damages or the allocation of liability. Rather, "[t]he allocation of Indian Harbor's share of any defense or indemnity obligation shall be left to be determined separately by either a subsequent motion or at time of trial." (NAC Reply at 25; Bortolazzo Reply at 24.) Finally, because the Court does not rely on expert Charles Henderson's opinions, any evidence Indian Harbor could develop to refute those opinions would not defeat summary judgment. For these reasons, the Court **DENIES** Indian Harbor's Rule 56(d) request.

## IV.

## CONCLUSION

1      For the reasons set forth above, the Court concludes that the undisputed facts

2  show that Indian Harbor had a duty to defend Bortolazzo as of August 14, 2009.  The

3  Court accordingly **GRANTS** Bortolazzo's and NAC's motions for partial summary

4  judgment as to the duty to defend.  The Court **DENIES** Indian Harbor's motion for

5  summary judgment and its request for a continuance under Federal Rule of Civil

6  Procedure 56(d).

7

8      **IT IS SO ORDERED.**

9

10 DATED:  March 22, 2011

11  _____

12  Gary Allen Feess
   United States District Judge